**AFFIRMED and Opinion Filed April 29, 2022**



In The
**Court of Appeals**
**Fifth District of Texas at Dallas**

_____

**No. 05-21-01163-CV**
_____

**IN THE INTEREST OF J.C.N AND J.C.N., CHILDREN**

**On Appeal from the 301st Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DF-17-19303-T**

## MEMORANDUM OPINION

Before Justices Reichek, Nowell, and Carlyle
Opinion by Justice Reichek

This is an appeal by Mother from a final decree terminating her parental rights to two of her children, J.C.N. and J.C.N. (the "Children"). In six issues, Mother contends her due process rights were violated by proceeding to trial virtually and the evidence was legally and factually insufficient to support the trial court's findings. We affirm the decree of termination.

### Background

On November 6, 2018, the Dallas County Child Protective Services Unit of the Texas Department of Family and Protective Services ("CPS") filed a motion to modify a prior order and original petition for protection of children, conservatorship, and termination of the parent-child relationship. Attached to the petition was an

affidavit in support of removal of the Children signed by Briana Spears, an authorized CPS representative. Spears testified that, six weeks earlier, CPS received a report that Mother was seen in a homeless shelter speaking in a harsh tone to the Children and pulling on the Children's wrists. Mother was further observed shouting in the younger child's face and shoving food in her mouth because she was eating too slowly. Mother was then seen throwing the food in the trash. At the time of the incident, the younger child was sixteen months old and the older child was three years old. When asked about the allegations in the referral, Mother denied the incident occurred.

Spears stated that, upon arrival at the shelter, Mother tested positive for marijuana use. Mother later tested positive for cocaine use. After working with Mother for several weeks, CPS filed its petition alleging the Children "are in present danger due to [Mother's] consistent use of cocaine and marijuana while they are in her care." The Children were removed and placed in foster care. The trial court signed temporary orders requiring Mother to participate in various services including individual counseling, parenting classes, a drug and alcohol assessment, and random drug and alcohol tests.

On October 21, 2021, a bench trial was conducted via Zoom teleconference. At the beginning of the trial, Mother's counsel stated she was concerned about the proceeding being conducted virtually because the emergency order allowing for virtual trials due to Covid 19 had not been extended. Counsel stated that, because

–2–

the order had not been extended, "it raises due process issues for my client in terms of whether or not the Court has jurisdiction and whether or not they can exercise the kind of trial that's anticipated today." Counsel also expressed concerns about Mother's internet stability. It was during this discussion that it became apparent Mother was attending the trial while driving a vehicle. Mother's counsel conceded the trial was originally scheduled to be conducted with everyone in attendance in the courtroom, but Mother "decided not to be in person" and requested to have the proceeding conducted over Zoom. The court acknowledged that internet connectivity issues could arise and stated she would ensure they did not "lose anybody" during the proceedings. The court further stated they would work around any issues that arose.

As its first witness, CPS called Cornelius Brown. Brown stated he knew Mother because his brother had been in a relationship with her. When questioned about Mother's living conditions, Brown replied she had a "really nasty house" with "dog poop on the floors, pee on the floors, [and] clothes everywhere." Brown stated he last saw Mother approximately one month before trial. According to Brown, at that time Mother was holding a cup full of alcohol and she appeared "very, very tipsy" because she had red eyes and was stumbling.

Brown stated that, sometime later, Mother asked his brother if she could take his car to the gas station to get cigarettes. Mother then took the car and never returned. Brown attempted to find Mother with "different satellite things" to

pinpoint her location. When he finally spoke to Mother a week before trial, Mother told him she was in Mississippi, but was heading back to Dallas and would return the car when she got back.

Brown testified for approximately fifteen minutes, during which time he was cross-examined by both Mother's counsel and the Children's guardian ad litem. Immediately after counsel for CPS began her redirect examination, however, Brown became frustrated and stated he needed to go back to work. Brown then terminated his connection to the proceeding.

CPS next called Mother as a witness. Mother stated she was in Mississippi and was driving back to Dallas. She said she was driving while testifying because she did not have anywhere to stop. The court requested Mother try to find somewhere safe to pull over so she would not be driving during the trial. Mother conceded she was aware of the trial setting and, when asked if there was a reason she planned to be driving during the trial instead of returning to Dallas a day earlier, she responded, "No, there is no reason why." The record shows that, after further requests by the trial court, Mother eventually pulled over and parked.

In response to a question about her drug history, Mother stated, "First and foremost, I don't have a drug problem. Never did have a drug problem. . . . I don't have no addiction to any drug. I have only used one consistently, and that's marijuana, and the last day I used that was July 3 of 2019." Mother further testified

she had never done cocaine and, although she had probably taken ecstasy, it was not her "drug of choice."

Mother was then asked about her failure to submit to drug testing. Mother admitted she was aware that drug tests had been requested or scheduled eight different times in the ten months prior to trial and that she did not take any of them. Mother additionally admitted she was aware that her failure to submit to a requested drug test would be deemed a positive result and she had no documentation to show she was sober at any point in the last three years. Although Mother denied having used illegal drugs since 2019, when asked why she did not go to any of the requested drug tests, Mother stated "I have to plead the fifth on that." Mother was informed that she was free to rely on her rights under the Fifth Amendment, but the court could draw negative inferences from her doing so because this was a civil case. Despite this warning, Mother continued to choose not to answer the question about the reason she refused to get a drug test.

Mother also admitted she frequently missed both virtual and in-person visits with the Children. Mother testified she sometimes could not make it because of work or transportation issues. Mother said she had three other children before giving birth to the Children at issue. According to Mother, her older children were living with their paternal grandmother somewhere in New Orleans, but she had no contact with them. Mother stated she gave the children to their grandmother in 2008 because she was going through the "jail systems" and she needed to "get [her] illegal dealings

taken care of." Mother's "illegal dealings" involved charges of burglary of a habitation.

Mother was then asked whether she was currently pregnant and she stated she was. When asked about the identity of the father, Mother became upset and terminated her connection to the proceeding. She returned a short time later. When asked again about the identity of the father, Mother stated he was one of two possible men, but neither would be involved with the new baby's life or with the Children.

Although Mother had been working in home health care, Mother testified she stopped working because of health issues two months before trial. Mother said she could go back to her home health care job, but she had been trying to open a restaurant. She said opening a restaurant would allow her to have more consistent time with the Children and she was waiting for paperwork from the City of Dallas.

With respect to the court ordered programs, Mother testified she had completed individual counseling, a chemical dependency out-patient treatment program, and parenting training. Mother stated the parenting classes did not help her to become a better parent because she felt like there was nothing she needed help with in that area. She said the program did help her to "become more calm about how I will react to the way people act around my kids, being a parent like that."

Mother said she moved into a three bedroom apartment in December 2019 and she cleans it every day because she did not want the Children getting sick from bacteria or bug bites. Mother stated she currently uses a kitchen knife to lock her

bedroom door at night because she is afraid of someone breaking into her apartment and having "easy access" to her. If she regained custody of the Children, Mother said she would no longer lock her bedroom door and she would have them sleep upstairs while she slept downstairs to protect them. Mother said she could provide whatever the Children needed and she had already purchased some furniture, bedding, and toys for them.

Yesenia Graciano Sanchez, a CPS case worker, was assigned to Mother's case in December 2020. Sanchez testified she did a walk-through of Mother's apartment and observed a double lock on Mother's bedroom door and a "big kitchen knife" next to it. When asked to explain the locks and the knife, Mother her told her it was because she is small and "you hear things happen all the time."

Sanchez testified that, in her eleven months on the case, Mother had thirty-six visits scheduled with the Children and only attended fifteen. When Mother did not show up for the visits, the Children would become upset. Because of this, they instituted a procedure under which Mother had to confirm her attendance at each visit twenty-four hours beforehand. The only time the Children were not made available after Mother confirmed a visit was when Mother sent her confirmation approximately half-an-hour before the scheduled visit.

Sanchez additionally testified that she repeatedly informed Mother she needed to submit the court ordered drug tests and gave her a location where she could test

on Saturday so it would not interfere with her work schedule. Mother told Sanchez she was not using drugs, but she did not get tested.

In August 2021, Sanchez requested Mother take a drug test because she was concerned about Mother's erratic behavior. Mother appeared anxious and fidgety and said she was scared to go into the restroom. Mother again refused to take the test saying she did not want to be tested because she was pregnant. Sanchez said she made it clear to Mother that her failure to take the requested drug tests would be considered a positive result.

Overall, Sanchez stated Mother did not appear to be improving and had not made the necessary changes to provide a safe environment for the Children. Sanchez opined it was in the Children's best interest to have Mother's parental rights terminated, and to have CPS appointed as permanent managing conservator. Sanchez stated CPS was working to facilitate the Children's adoption by their current foster family.

Sade Benjamin, a Court Appointed Special Advocate ("CASA") volunteer, testified she had visited with the Children in their current foster home and felt the home was stable and a good fit for the Children. According to Benjamin, the Children had formed a significant bond with their foster family and it would be in the Children's best interest to be adopted by them. Benjamin was concerned that she had never seen a clean drug test for Mother and, although Mother frequently

contacted her immediately after the Children were removed, that tapered off and she currently had no contact with Mother.

The Children's foster father also testified saying he and his wife wanted to adopt the Children. He said the Children had been with them for fourteen months and had adjusted well. He described their daily routine and said the Children were attending both play therapy and behavioral therapy. He also said they had a great deal of support, including his mother who lived nearby, and four different families with whom they were close and who helped them when needed. The foster father said he loves the Children and his long-term goal was for them to attend college and provide for themselves.

After hearing the evidence, the trial court stated that, while it appreciated that Mother had completed certain services, it was very concerning that she had failed to demonstrate any sustained sobriety. The court further stated the level of concern was such that termination of Mother's parental rights was necessary and in the best interest of the Children. In its order, the trial court specifically found that clear and convincing evidence established Mother (1) knowingly placed or knowingly allowed the Children to remain in conditions or surroundings which endanger their physical or emotional well-being, (2) engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangers the physical or emotional well-being of the children, and (3) failed to comply with the provisions of a court order that specifically established the actions necessary to obtain return of her

children.  CPS was appointed as the Children's permanent managing conservator with the right to consent to their adoption.  Mother brought this appeal.

**Analysis**

## I. Due Process

In her first issue, Mother contends that proceeding to trial virtually violated her right to procedural due process.  Although Mother's counsel stated at the beginning of trial that she had some "due process concerns" about proceeding virtually, those concerns were primarily jurisdictional, a challenge she does not raise on appeal.  And while counsel also noted she had concerns about Mother's internet stability, she acknowledged the trial was being conducted over Zoom at Mother's request.  Indeed, the record shows that trial was originally scheduled to occur in person, but Mother decided she would rather have the proceeding conducted virtually.  A party cannot complain on appeal that the trial court took a specific action the complaining party requested.  *In re Dept. of Family & Protective Servs.*, 273 S.W.3d 637, 646 (Tex. 2009) (orig. proceeding) (quoting *Tittizer v. Union Gas Corp.*, 171 S.W.3d 857, 862 (Tex. 2005).

Mother cites multiple examples in her brief to suggest her unstable internet connection "contaminated" the proceeding because the record is "fraught with the possibility of testimony being misheard or incorrectly recorded, or not heard or recorded at all."  In every cited example, however, the trial court ensured the questions and answers were clarified and properly recorded. And while Mother

–10–

suggests a *possibility* of an inaccurate record, she provides no examples of any actual inaccuracies.

Furthermore, the examples cited by Mother of difficulties with her testimony at trial were caused almost entirely by Mother's choice to be travelling while testifying. After the trial court required Mother to stop driving, her internet connection remained largely stable. Once again, under the doctrine of invited error, a party cannot create a problem and later assert that problem as the basis for reversal. *See In re A.I.F.*, No. 07-17-00464-CV, 2018 WL 2272604, at *2 (Tex. App.—Amarillo May 17, 2018, no pet.) (mem. op.); *In re S.T.*, 508 S.W.3d 482, 485 (Tex. App.—Fort Worth 2015, no pet.).[1] We resolve Mother's first issue against her.

## II. Sufficiency of the Evidence of Predicate Acts

In her second, third, and fourth issues, Mother contends the evidence is legally and factually insufficient to support the trial court's findings that she (1) knowingly placed or knowingly allowed the Children to remain in conditions or surroundings which endanger their physical or emotional well-being, (2) engaged in conduct or knowingly placed the children with persons who engaged in conduct which endanger the physical or emotional well-being of the Children, and (3) failed to comply with the provisions of a court order that specifically established the actions necessary to

---

[1] To the extent Mother discusses issues other than her internet stability as raising due process concerns, these issues were not raised in the trial court and are, therefore, waived. *See In re L.M.I.*, 119 S.W.3d 707, 711 (Tex. 2003).

obtain return of the Children. All three findings are among those listed in section 161.001(b)(1) of the Texas Family Code as an act or omission that would support the involuntary termination of Mother's parental rights. *See* TEX. FAM. CODE § 161.001(b)(1)(D), (E), &(O).

A court may order termination of a parent-child relationship if the court finds by clear and convincing evidence that the parent committed one or more acts or omissions enumerated in section 161.001(b)(1) and that termination is in the child's best interest. *Id*. § 161.001(b)(1) & (2). Because the fundamental liberty interest of parents in the care, custody, and control of their children is of constitutional dimensions, involuntary parental terminations are strictly scrutinized. *In re K.M.L.*, 443 S.W.3d 101, 112 (Tex. 2014). Due process requires the petitioner to justify termination by clear and convincing evidence. TEX. FAM. CODE § 161.001(b); *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012). Clear and convincing evidence is that measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. *In re N.G.*, 577 S.W.3d 230, 235 (Tex. 2019) (per curiam); *In re N.T.*, 474 S.W.3d 465, 475 (Tex. App.—Dallas 2015, no pet.).

Our standard of review reflects the elevated burden at trial. *In re A.B.*, 437 S.W.3d 498, 502 (Tex. 2014); *In re A.T.*, 406 S.W.3d 365, 370 (Tex. App.—Dallas, pet. denied). Under both legal and factual sufficiency standards, we consider all the evidence, defer to the factfinder's credibility determinations, and determine whether

–12–

the factfinder could reasonably form a firm belief or conviction that the grounds for termination were proven. *In re J.F.C.*, 96 S.W.3d 256, 265–66 (Tex. 2002); *In re N.T.*, 474 S.W.3d at 475. "The distinction between legal and factual sufficiency lies in the extent to which disputed evidence contrary to a finding may be considered." *In re A.C.*, 560 S.W.3d 624, 630–31 (Tex. 2018).

In conducting a legal-sufficiency review of an order terminating parental rights, the reviewing court cannot ignore undisputed evidence contrary to the finding but must otherwise assume the factfinder resolved disputed facts in favor of the finding. *Id.* We "consider all the evidence, not just that which favors the verdict," and assume the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. *In re N.T.*, 474 S.W.3d at 475. We disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. *Id.*

When reviewing the factual sufficiency of the evidence supporting a termination finding, we ask whether, in light of the entire record, the evidence is such that a factfinder could reasonably form a firm conviction about the truth of the allegations against the parent. *Id.*; *In re J.D.B.*, 435 S.W.3d 452, 463 (Tex. App.—Dallas 2014, no pet.). We must consider whether the disputed evidence is such that a reasonable factfinder could not have reconciled it in favor of its finding. *In re N.T.*, 474 S.W.3d at 475. If the disputed evidence is so significant that a factfinder could

–13–

not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. *Id.*

Section 161.001(b)(1)(E) authorizes termination if the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(b)(1)(E). In this context, "endanger" means to expose to loss or injury, or to jeopardize a child's emotional or physical health. *See In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (per curiam); *see also In re C.V.L.*, 591 S.W.3d 734, 750 (Tex. App.—Dallas, 2019, pet. denied). Although endangerment requires "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, it is not necessary that the conduct be directed at the child or that the child actually suffers injury." *M.C.*, 917 S.W.2d at 269. A parent's conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.— Fort Worth 2004, pet. denied). The specific danger to the child's well-being may be inferred from parental misconduct standing alone. *Cervantes-Peterson v. Tex. Dep't of Family & Protective Servs.*, 221 S.W.3d 244, 253 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (en banc).

Subsection (E) refers to the parent's conduct, as evidenced not only by the parent's acts, but also by the parent's omissions or failures to act. *In re S.K.*, 198 S.W.3d 899, 902 (Tex. App.—Dallas 2006, pet. denied). Termination under

subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. *C.V.L.*, 591 S.W.3d at 750. In determining whether a parent engaged in a course of endangering conduct, a trial court may consider conduct that occurred before and after the child's birth, in the child's presence and outside the child's presence, and before and after removal by the department. *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009).

A large amount of the evidence at trial concerned Mother's repeated failures to submit to drug testing. Mother admitted she knew she was required to get tested and that she failed to do so on eight different occasions. Mother further admitted she knew that her failure to submit to drug testing would be deemed a positive result and she had no documentation to show she had ever been sober since the Children were removed. Mother failed to give an explanation for her failure to test, relying instead on her Fifth Amendment right against self-incrimination. A factfinder can reasonably infer that a parent's failure to submit to court-ordered drug tests indicates the parent is avoiding testing because they were using illegal drugs. [2] *In re E.R.W.*, 528 S.W.3d 251, 265 (Tex. App.—Houston [14th Dist.] 2017, no pet.); *see also In re J.S.* No. 14-18-00709-CV, 2019 WL 438821, at *7 (Tex. App.—Houston [14th Dist.] Feb. 5, 2019, pet. denied) (mem. op.) ("Mother's refusal to submit to drug testing, which could have revealed not only marijuana use, but also other drug use,

---

[2] The Fifth Amendment does not forbid adverse inferences against parties to civil actions. *See In re T.B.*, 594 S.W.3d 773, 780 (Tex. App.—Waco 2019, no pet.).

may be treated by the trial court as if she had tested positive for drugs."). Furthermore, a parent's decision to engage in illegal drug use during the pendency of a termination suit, when a parent is at risk of losing a child, may support a finding that the parent engaged in conduct that endangered the child's physical or emotional well-being. *Id*.; *see also In re D.B.S.*, No. 05-20-00959-CV, 2021 WL 1608497, at *6 (Tex. App.—Dallas April 26, 2021, pet. denied) (mem. op.) (parent's drug use supports conclusion that parent is endangering children's well-being).

Mother relies on the case of *In re J.E.H.*, 384 S.W.3d 864 (Tex. App.—San Antonio 2012, no pet). to argue that CPS failed to present any evidence that Mother used drugs in a manner that endangered the health or safety of the Children. *In re J.E.H.* is inapplicable, however, because the ground for termination at issue in that case was section 161.001(b)(1)(P). *Id.* at 869. Subsection (P) requires specific proof that the parent used a controlled substance in a manner that endangered the child's health or safety. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(P). In contrast, subsection (E), which is the subsection at issue here, contains no such requirement. *Id*. § 161.001(b)(1)(E).

Although Mother completed a drug assessment program, she testified she was not an addict and had never had a problem with drugs. Mother's refusal to acknowledge that her use of illegal drugs was a problem, and her continued use of drugs after the Children were removed, indicates she lacked motivation to stop using drugs and would likely continue to use them if the Children were returned to her.

*See In re C.R.*, 263 S.W.3d 368, 373 (Tex. App.—Dallas 2008, no pet.); *see also In re A.O.*, No. 05-21-00789-CV, 2022 WL 620631, at *7 (Tex. App.—Dallas, March 3, 2022, no pet. h.) (mem. op.) (evidence indicating continued therapy would not be effective to prevent drug use in future supports finding under subsection (E)).

In addition to Mother's drug use, the record shows Mother repeatedly missed visits with the Children, including virtual visits. Mother's case worker testified that, of the thirty-six visits scheduled in the ten months before trial, Mother attended only fifteen. Because the Children would become upset when Mother did not attend, it became necessary to institute a policy requiring Mother to confirm her attendance twenty-four hours before a scheduled visit. Mother conceded she missed many of the visits with the Children, but said she sometimes did not have transportation or she could not get away from work. The case worker stated Mother had missed recent visits because she was out-of-town. Inconsistent participation in visitation with a child is conduct that can endanger their emotional well-being. *See In re D.B.S.*, 2021 WL 1608497, at *6.

Applying the appropriate standards of review, we conclude the evidence is legally and factually sufficient to support the trial court's finding that Mother engaged in conduct which endangered the physical or emotional well-being of the Children. *Id*. We resolve Mother's third issue against her. Having concluded the evidence is sufficient to support the trial court's finding under section 161.001(b)(1)(E), we need not address her arguments that the evidence is legally and

–17–

factually insufficient to support the trial court's findings under subsections (D) and (O). *See R.G, v. Dept. of Family & Protective Servs.*, No 14-21-00584-CV, 2022 WL 906190, at *7 (Tex. App.—Houston [14th Dist.] March 29, 2022, no pet, h.) (mem. op.).

## III. Best Interest of the Children

In her fifth issue, Mother challenges the trial court's finding that termination of her parental rights is in the Children's best interest. There is a strong presumption that the best interest of a child is served by keeping the child with the child's natural parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam). However, prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. *In re S.R.*, 452 S.W.3d 351, 366 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). The considerations the factfinder may use to determine a child's best interest, known as the *Holley* factors, include:

(1) the desires of the child;

(2) the present and future physical and emotional needs of the child;

(3) the present and future physical and emotional danger to the child;

(4) the parental abilities of the person seeking custody;

(5) the programs available to assist the person seeking custody in promoting the best interest of the child;

(6) the plans for the child by the individuals or agency seeking custody;

(7) the stability of the home or proposed placement;

(8) acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate; and

(9) any excuse for the parent's acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These considerations are guidelines and a best-interest finding does not require proof of any specific set of factors. *In re S.R.*, 452 S.W.3d at 366. The considerations are also not exhaustive and CPS was not required to prove all of them as a condition precedent to terminating Mother's rights. *See In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). Evidence relating to a single factor may be adequate in a particular situation to support a finding that termination is in the best interest of a child. *In re K.S.*, 420 S.W.3d 852, 855 (Tex. App.—Texarkana 2014, no pet.).

In this case, the Children were removed from Mother's care when they were both under the age of four. Approximately fourteen months before trial, the Children began living with foster parents who expressed a desire to adopt both Children. The CASA volunteer assigned to the case testified the Children had formed a significant bond with their foster parents. The foster father testified he loved the Children and his goal was raise them to be independent and go to college. He further stated the Children participated in various therapies, had adjusted well to life with him and his wife, and they had support from both extended family and friends.

When children are too young to express their desires, the factfinder may consider that the children have bonded with the foster family, are well cared for by them, and have spent minimal time with the parent. *In re L.G.R.*, 498 S.W.3d 195, 205 (Tex. App.—Houston [14th Dist.] 2016, pet. denied). A child's need for

–19–

permanence through the establishment of a stable, permanent home has been recognized as the paramount consideration in a best-interest determination. *In re K.C.*, 219 S.W.3d 924, 931 (Tex. App.—Dallas 2007, no pet.). Here, factors (1), (6), and (7) weigh heavily in favor of termination being in the Children's best interest.

Evidence of a parent's unstable lifestyle can support a factfinder's conclusion that termination of parental rights is in a child's best interest. *In re S.B.*, 207 S.W.3d 877, 887 (Tex. App.—Fort Worth 2006, no pet.). At the time of trial, Mother was unemployed. Although Mother was previously employed as a home health-care worker, she ceased working several months before trial due to unspecified health issues. Mother stated she could go back to her job as a health-care worker, but was hoping to open a restaurant. Mother did not provide any details about the proposed restaurant other than to state she was waiting on paperwork from the City of Dallas.

During trial, Mother was travelling out-of-state in an allegedly stolen vehicle. Mother stated she knew trial was scheduled for that day and she had no justification or excuse for travelling during the proceeding. The record also shows Mother failed to appear at two permanency hearings prior to trial.

Mother testified she had a three-bedroom apartment, but also stated she was so afraid of someone breaking in at night that she locked herself in the bedroom with a kitchen knife. Her ex-boyfriend's brother testified he had been to her apartment

on multiple occasions and seen dog feces and urine on the floor.[3]  According to the CPS caseworker Mother's behavior demonstrated an inability to provide the Children with a safe environment.  A lack of stability, including the absence of a safe and stable home environment, supports a finding that a parent is unable to provide for a child's emotional and physical needs.  *See In R.G.*, 2022 WL 906190, at * 8.  We conclude the evidence shows that factors (2) and (3) weigh in favor of the trial court's finding that termination is in the Children's best interest.

Finally, with respect to Mother's parenting abilities, Mother stated, the Children loved her and they considered her their best friend.  Yet Mother missed the majority of her scheduled visits with the Children, including virtual visits, even after she was no longer employed.  Mother stated the court-ordered parenting classes she participated in did not help her because she felt there was no aspect of parenting with which she needed help.  Accordingly, as with the drug treatment program in which Mother participated, the record indicates that services available to Mother would not assist her in promoting the Children's best interest because of her unwillingness or lack of motivation to change.

---

[3] Mother suggests, without argument or authority, that we should disregard this testimony because the witness abruptly left the virtual trial venue before being fully cross-examined.  The record shows, however, that both Mother's counsel and the guardian ad litem had ended their cross-examinations and passed the witness at the time he ended his connection to the proceeding.  Mother's counsel raised no issue in the trial court regarding the inability to ask the witness further questions and makes no showing on appeal as to what questions she did not have an opportunity to ask.

–21–

Mother stated her oldest three children have been living with their paternal grandmother somewhere in New Orleans since 2008 and she has no contact with them. Several months before trial, Mother became pregnant with her sixth child. When asked about her current pregnancy, Mother became belligerent and temporarily left the proceedings. Mother did not know which of two men was the father of her most recent child, but stated neither of them would be involved with the child. During her pregnancy, Mother continued to refuse drug tests, from which the trial court could infer she was using illegal narcotics while pregnant. *See In re E.R.W.*, 528 S.W.3d at 265. The continued use of drugs while pregnant and after removal of the Children demonstrates a lack of parental abilities. *See In re A.O.*, 2011 WL 620631, at *9. Factors (4), (5), and (8) also weigh in favor of the trial court's decision.

Based on the foregoing, we conclude the evidence allowed the trial court to form a firm conviction or belief that terminating Mother's parental rights was in the Children's best interest. We resolve Mother's fifth issue against her.

## IV. Conservatorship

In her sixth issue, Mother argues the evidence is legally and factually insufficient to support the appointment of CPS as the Children's permanent managing conservator. We review conservatorship determinations for an abuse of discretion and reverse only if the decision is arbitrary and unreasonable. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007). Under this standard, challenges to the legal and

–22–

factual sufficiency of the evidence are not independent grounds of error, but are factors in assessing whether the trial court abused its discretion. *In re N.E.*, No. 05-15-00361-CV, 2015 WL 5244334, at \*13 (Tex. App.—Dallas Sept. 8, 2015, pet. denied).

Mother argues the Texas Family Code creates a rebuttable presumption that a parent will be named the child's managing conservator unless the court finds that such appointment would not be in the child's best interest because the appointment would significantly impair the child's physical health or emotional development or finds that there is a history of family violence involving the parents. *See* TEX. FAM. CODE ANN. § 153.131(a). In this case, the parental rights of both the Children's parents were terminated. The record shows the Children's father was properly served with process and was aware of the case, but made no appearance and has not appealed the termination of his rights. As this Court has previously held, there is no authority for the proposition that the presumption in favor of naming a parent as conservator applies to a parent whose parental rights have been terminated. *In re N.E.*, 2015 WL 5244334 at \*14. Under section 161.207, once the court terminates the parent-child relationship with respect to both parents, the court must appoint a suitable competent adult, CPS, or a licensed child-placing agency as the child's managing conservator. TEX. FAM. CODE ANN. § 161.207(a). Because we have already overruled Mother's challenge to the termination of her parental rights, the trial court's appointment of CPS as sole managing conservator may be considered a

consequence of the termination under section 161.207 of the family code. *In re N.E.*, 2015 WL 5244334 at *14. We resolve Mother's sixth issue against her.

We affirm the trial court's decree of termination.

/Amanda L. Reichek/
AMANDA L. REICHEK
JUSTICE

211163F.P05



## Court of Appeals
## Fifth District of Texas at Dallas

### JUDGMENT

IN THE INTEREST OF J.C.N. AND J.C.N., CHILDREN

No. 05-21-01163-CV

On Appeal from the 301st Judicial District Court, Dallas County, Texas Trial Court Cause No. DF-17-19303-T.
Opinion delivered by Justice Reichek. Justices Nowell and Carlyle participating.

In accordance with this Court's opinion of this date, the trial court's decree of termination is **AFFIRMED**.

Judgment entered April 29, 2022